## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### CASE NO. _____-CIV-_____

ANNETTE BARNES, MELISSA COOPER,
ALFREDO CORTES, NANCY HADDEY,
KENTRELL HILLS, EDWARD MOSS,
DESIREE NIEGSCH, MAIQUEL
RODRIGUEZ, and DEREK WILLIAMS, on
behalf of themselves and all others similarly
situated,

       Plaintiffs,

vs.

CS MARKETING LLC, HEALTH
INSURANCE INNOVATIONS, INC.,
INSURANCE CARE DIRECT, INC.,
MANAGED BENEFIT SERVICES, LLC,
MHP INSURANCE SOLUTIONS LLC,
SIMPLE HEALTH PLANS LLC,
USHEALTH ADVISORS, LLC,

       Defendants.

_____/

**CLASS ACTION**

**JURY TRIAL DEMANDED**

     Plaintiffs, ANNETTE BARNES, MELISSA COOPER, ALFREDO CORTES, NANCY

HADDEY, KENTRELL HILLS, EDWARD MOSS, DESIREE NIEGSCH, MAIQUEL

RODRIGUEZ, and DEREK WILLIAMS (collectively, "Plaintiffs"), individually and on behalf of

all others similarly situated, by their undersigned attorneys, for their Complaint against

Defendants, CS MARKETING LLC ("CS Marketing"), HEALTH INSURANCE

INNOVATIONS, INC. ("Health Insurance Innovations"), INSURANCE CARE DIRECT, INC.

("Insurance Care Direct"), MANAGED BENEFIT SERVICES, LLC ("MBS"), MHP

INSURANCE SOLUTIONS LLC ("MHP Insurance"), SIMPLE HEALTH PLANS LLC ("Simple

Health"), USHEALTH ADVISORS, LLC ("USHealth") (collectively, "Defendants"), allege the

following based upon personal knowledge as to themselves and their own action, and, as to all

other matters, respectfully allege, upon information and belief and investigation of their counsel, as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices.  *See Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368, 372 (2012).

2.      Plaintiffs allege that Defendants commissioned automated telemarketing calls to them and other class members without their prior express written consent. Each of the calls were made pursuant to an agreement between Defendants and non-party, All Web Leads, Inc. ("All Web Leads"), a company that Defendants hired to make telemarketing calls on their behalf and for their benefit.

3.      Plaintiffs and class members never consented to receive these calls.  Defendants nonetheless engaged in a nationwide telemarketing campaign designed to sell health insurance to consumers.

4.      Non-party All Web Leads has already paid for its role in this illegal telemarketing campaign and entered into a class action settlement agreement for $6.5 million, which was finally approved on August 8, 2019.  *See Karpilovsky v. All Web Leads, Inc.*, Case No. 1:17-cv-1307 (N.D. Ill.) (Dkt. 172).

5.      This action seeks to hold Defendants accountable for their violations of the TCPA though this telemarketing campaign.

6.     Because this telemarketing campaign placed calls to hundreds of thousands of potential customers *en masse*, Plaintiffs bring this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendants.

7.     A class action is the best means of obtaining redress for the Defendants' wide-scale illegal telemarketing campaign and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## **PARTIES**

8.     Plaintiff Maiquel Rodriguez is a citizen of the State of Florida residing in the City of Miami Gardens.

9.     Plaintiff Alfredo Cortes is a citizen of the State of Florida residing in the City of Miami.

10.     Plaintiff Edward Moss is a citizen of the State of Florida residing in the City of Miami.

11.     Plaintiff Derek Williams is a citizen of the State of Florida residing in the City of Miami.

12.     Plaintiff Annette Barnes is a citizen of the State of Florida residing in the City of Miami.

13.     Plaintiff Nancy Haddey is a citizen of the State of Florida residing in the City of Miami.

14.     Plaintiff Kentrell Hills is a citizen of the State of Florida residing in the City of Miami.

15.     Plaintiff Melissa Cooper is a citizen of the State of California residing in the City of El Granda.

16.     Plaintiff Desiree Niegsch is a citizen of the State of California residing in the City of San Francisco.

17.     Defendant CS Marketing is a limited liability company with its principal place of business in Fort Lauderdale, Florida.

18.     Defendant Health Insurance Innovations is a corporation with its principal place of business in Tampa, Florida.

19.     Defendant Insurance Care Direct is a corporation with its principal place of business in Deerfield Beach, Florida.

20.     Defendant MBS is a limited liability company with its principal place of business in Carlsbad, California.

21.     Defendant MHP Insurance is a limited liability company with its principal place of business in San Diego, California.

22.     Defendant Simple Health is a limited liability company with its principal place of business in Hollywood, Florida.

23.     Defendant USHealth is a limited liability company with its principal place of business in Fort Worth, Texas.

## JURISDICTION AND VENUE

24.     The Court has federal question subject matter jurisdiction over these TCPA claims pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 277 *et seq.  Mims v. Arrow Financial Services, LLC*, 565 U.S. 368 (2012).

25.     The Court has personal jurisdiction over Defendants because the conduct as issue in this case occurred, among other locations, in Florida.

26.     Venue is proper in the United States District Court for the Southern District of Florida under 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this District, as the automated calls were placed to Plaintiffs and class members living in this District.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991 (TCPA), 47 U.S.C. § 227

27.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]"  Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

28.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service or to a number that is charged per call.  *See* 47 U.S.C. § 227(b)(1)(A).  The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A).  *See* 47 U.S.C. § 227(b)(3).

29.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

30.     The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used."  *In re Rules and Regulations*

5

*Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

31.     In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

## **THE GROWING EPIDEMIC OF AUTOMATED TELEMARKETING**

32.     "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC."[1]

33.     "The FTC receives more complaints about unwanted calls than all other complaints combined."[2]

---

[1] Tom Wheeler, Cutting Off Robocalls (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman).

[2] Staff of the Federal Trade Commission's Bureau of Consumer Protection, In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016), https://www.ftc.gov/system/files/documents/advocacy_documents/commentstaff-ftc-bureau-consumer-protection-federal-communications-commission-rulesregulations/160616robocallscomment.pdf.

34.     In fiscal year 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016.[3]

35.     *The New York Times* reported on the skyrocketing number of robocall complaints and widespread outrage about illegal telemarketing.[4]

36.     Accordingly, Ajit Pai, Chairman of the FCC, dubbed illegal robocalls the FCC's "top consumer protection priority."[5]   Indeed, as the FFC has observed:

> *Unwanted calls are far and away the biggest consumer complaint to the FCC* with over 200,000 complaints each year—around 60 percent of all the complaints we receive. Some private analyses estimate that U.S. consumers received approximately 2.4 billion robocalls per month in 2016.

*Id*.  (emphasis added).

## FACTUAL ALLEGATIONS

### *Defendants Engaged in a Concerted, Uniform and Unlawful Telemarketing Campaign Through Their Agent All Web Leads*

37.     At all relevant times herein, All Web Leads operated as a marketing business in the U.S. insurance industry that delivered consumers purportedly interested in purchasing insurance otherwise known as "leads" to Defendants.

---

[3] Federal Trade Commission, FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-nationaldo-not-call-registry-data-book-dnc.

[4] Tara Siegel Bernard, Yes, It's Bad. Robocalls, and Their Scams, Are Surging, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html; see also Katherine Bindley, Why Are There So Many Robocalls? Here's What You Can Do About Them, Wall St. J. (July 4, 2018), https://www.wsj.com/articles/why-there-are-so-many-robocalls-heres-what-you-can-do-about-them-1530610203.

[5] https://www.fcc.gov/about-fcc/fcc-initiatives/fccs-push-combat-robocalls-spoofing (last accessed June 10, 2019).

38.     All Web Leads generated the "leads" by placing telemarketing robocalls to consumers to see if they might be interested in purchasing insurance, and then transferring those calls to the Defendants.

39.     On behalf of Defendants and at their direction, All Web Leads made hundreds of thousands of autodialed telemarketing calls to Plaintiffs and class members without their prior express consent to inquire whether Plaintiffs and the Class were interested in purchasing insurance.

40.     Defendants, through All Web Leads, orchestrated a mass unlawful telemarketing campaign to Plaintiffs and the Class through the use of a single, uniform website— www.affordable-health-insurance-plans.org. (the "Affordable Health Care Website")— that all of the Plaintiffs and Class Members visited for purposes of obtaining health insurance quotes online.

41.     What's more, the Affordable Health Care Website was deceptively designed to appear, similarly to the government-run "Healthcare.gov" marketplace website, as though it would generate health insurance quotes online.

42.     After Plaintiffs and the Class visited the Affordable Health Care Website, Defendants, through their agent All Web Leads, placed autodialed telemarketing calls to their cellular phones for the purpose of selling insurance without their prior express written consent in violation of the TCPA.

### *Calls to Plaintiffs*

43.     As set forth below, each Plaintiff received identical calls from Defendants.  Each call contained an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.  Each call was placed to a cellular telephone.  Each call was a telemarketing call that solicited Plaintiffs to purchase insurance.  Particularly because the calls were to cellular telephones, each call interrupted the Plaintiffs' lives, was annoying and

harassing to the Plaintiffs, and an invasion of their privacy.  What's more, the calls utilized data and memory on Plaintiffs' cell phones and further caused wear and tear on their phones' hardware and batteries, all for which they paid good and valuable consideration.  And each call was made without Plaintiffs' prior express written consent

### ***Calls to Plaintiff Cooper***

44.     Plaintiff Cooper visited the Affordable Health Care Website in search of health insurance quotes online.

45.     After Plaintiff Cooper visited the website, she received an autodialed telemarketing call placed by All Web Leads on behalf of Defendant CS Marketing on January 2, 2018 at or around 10:14 a.m.

46.     Upon answering the call, there was an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.

47.     The All Web Leads representative asked Plaintiff Cooper a series of questions to determine whether she met certain criteria specified by Defendant CS Marketing in order to find out if she was a qualified consumer to whom Defendant could sell insurance.

48.     After the series of questions concluded, Plaintiff Cooper was then transferred to a health insurance sales representative for Defendant CS Marketing.

49.     During that call, Defendant CS Marketing proceeded to solicit Plaintiff Cooper to purchase insurance.

50.     The call was annoying and harassing to Plaintiff Cooper, and an invasion of her privacy.  The call violated the TCPA because it was made without Plaintiff Cooper's prior express written consent.

51.     To compound matters, on information and belief, Plaintiff Cooper received numerous other autodialed telemarketing calls to her cell phone as a result of becoming entangled in Defendants' unlawful telemarketing scheme.

***Calls to Plaintiff Rodriguez***

52.     Plaintiff Rodriguez visited the Affordable Health Care Website in search of health insurance quotes online.

53.     After Plaintiff Rodriguez visited the website, he received multiple autodialed telemarketing calls placed by All Web Leads on behalf of Defendant Health Insurance Innovations on January 3, 2018 at 8:33 a.m. and then again at 1:49 p.m.

54.     Upon answering the call, there was an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.

55.     The All Web Leads representative asked Plaintiff Rodriguez a series of questions to determine whether he met certain criteria specified by Defendant Health Insurance Innovations in order to find out if he was a qualified consumer to whom it could sell insurance.

56.     After the series of questions concluded, Plaintiff Rodriguez was then transferred to a health insurance sales representative for Defendant Health Insurance Innovations.

57.     During that call, Defendant Health Insurance Innovations proceeded to solicit Plaintiff Rodriguez to purchase insurance.

58.     The call was annoying and harassing to Plaintiff Rodriguez, and an invasion of his privacy.  The call violated the TCPA because it was made without Plaintiff Rodriguez's prior express written consent.

59.     To compound matters, on information and belief, Plaintiff Rodriguez received numerous other autodialed telemarketing calls to his cell phone as a result of becoming entangled in Defendants' unlawful telemarketing scheme.

### *Calls to Plaintiff Niegsch*

60.     Plaintiff Niegsch visited the Affordable Health Care Website in search of health insurance quotes online.

61.     After Plaintiff Niegsch visited the website, she received an autodialed telemarketing call placed by All Web Leads on behalf of Defendant Health Insurance Innovations on March 14, 2016 at 3:52 p.m.

62.     Upon answering the call, there was an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.

63.     The All Web Leads representative asked Plaintiff Niegsch a series of questions to determine whether she met certain criteria specified by Defendant Health Insurance Innovations in order to find out if she was a qualified consumer to whom it could sell insurance.

64.     After the series of questions concluded, Plaintiff Niegsch was then transferred to a health insurance sales representative for Defendant Health Insurance Innovations.

65.     During that call, Defendant Health Insurance Innovations proceeded to solicit Plaintiff Niegsch to purchase insurance.

66.     The call was annoying and harassing to Plaintiff Niegsch, and an invasion of her privacy.  The call violated the TCPA because it was made without Plaintiff Niegsch's prior express written consent.

67.     To compound matters, on information and belief, Plaintiff Niegsch received numerous other autodialed telemarketing calls to her cell phone as a result of becoming entangled in Defendants' unlawful telemarketing scheme.

***Calls to Plaintiff Cortes***

68.     Plaintiff Cortes visited the Affordable Health Care Website in search of health insurance quotes online.

69.     After Plaintiff Cortes visited the website, he received an autodialed telemarketing call placed by All Web Leads on behalf of Defendant Insurance Care Direct on May 5, 2018 at 7:36 a.m.

70.     Upon answering the call, there was an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.

71.     The All Web Leads representative asked Plaintiff Cortes a series of questions to determine whether he met certain criteria specified by Defendant Insurance Care Direct in order to find out if he was a qualified consumer to whom it could sell insurance.

72.     After the series of questions concluded, Plaintiff Cortes was then transferred to a health insurance sales representative for Defendant Insurance Care Direct.

73.     During that call, Defendant Insurance Care Direct proceeded to solicit Plaintiff Cortes to purchase insurance.

74.     The call was annoying and harassing to Plaintiff Cortes, and an invasion of his privacy.  The call violated the TCPA because it was made without Plaintiff Cortes' prior express written consent.

75.    To compound matters, on information and belief, Plaintiff Cortes received numerous other autodialed telemarketing calls to his cell phone as a result of becoming entangled in Defendants' unlawful telemarketing scheme.

**_Calls to Plaintiff Moss_**

76.    Plaintiff Moss visited the Affordable Health Care Website in search of health insurance quotes online.

77.    After Plaintiff Moss visited the website, he received multiple autodialed telemarketing calls placed by All Web Leads on behalf of Defendant Insurance Care Direct on May 24, 2018 at 2:10 p.m. and then again at 2:31 p.m.

78.    Upon answering the call, there was an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.

79.    The All Web Leads representative asked Plaintiff Moss a series of questions to determine whether he met certain criteria specified by Defendant Insurance Care Direct in order to find out if he was a qualified consumer to whom it could sell insurance.

80.    After the series of questions concluded, Plaintiff Moss was then transferred to a health insurance sales representative for Defendant Insurance Care Direct.

81.    During that call, Defendant Insurance Care Direct proceeded to solicit Plaintiff Moss to purchase insurance.

82.    The call was annoying and harassing to Plaintiff Moss, and an invasion of his privacy.  The call violated the TCPA because it was made without Plaintiff Moss' prior express written consent.

83.     To compound matters, on information and belief, Plaintiff Moss received numerous other autodialed telemarketing calls to his cell phone as a result of becoming entangled in Defendants' unlawful telemarketing scheme.

### *Calls to Plaintiff Williams*

84.     Plaintiff Williams visited the Affordable Health Care Website in search of health insurance quotes online.

85.     After Plaintiff Williams visited the website, he received an autodialed telemarketing call placed by All Web Leads on behalf of Defendant MBS on December 14, 2015 at 12:43 p.m.

86.     Upon answering the call, there was an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.

87.     The All Web Leads representative asked Plaintiff Williams a series of questions to determine whether het met certain criteria specified by Defendant MBS in order to find out if he was a qualified consumer to whom it could sell insurance.

88.     After the series of questions concluded, Plaintiff Williams was then transferred to a health insurance sales representative for Defendant MBS.

89.     During that call, Defendant MBS proceeded to solicit Plaintiff Williams to purchase insurance.

90.     The call was annoying and harassing to Plaintiff Williams, and an invasion of his privacy.  The call violated the TCPA because it was made without Plaintiff Williams' prior express written consent.

91.     To compound matters, on information and belief, Plaintiff Williams received numerous other autodialed telemarketing calls to his cell phone as a result of becoming entangled in Defendant's unlawful telemarketing scheme.

***Calls to Plaintiff Barnes***

92.     Plaintiff Barnes visited the Affordable Health Care Website in search of health insurance quotes online.

93.     After Plaintiff Barnes visited the website, she received an autodialed telemarketing call placed by All Web Leads on behalf of Defendant MHP Insurance on December 29, 2017 at 1:27 p.m.

94.     Upon answering the call, there was an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.

95.     The All Web Leads representative asked Plaintiff Barnes a series of questions to determine whether she met certain criteria specified by Defendant MHP Insurance in order to find out if she was a qualified consumer to whom it could sell insurance.

96.     After the series of questions concluded, Plaintiff Barnes was then transferred to a health insurance sales representative for Defendant MHP Insurance.

97.     During that call, Defendant MHP Insurance proceeded to solicit Plaintiff Barnes to purchase insurance.

98.     The call was annoying and harassing to Plaintiff Barnes, and an invasion of her privacy.  The call violated the TCPA because it was made without Plaintiff Barnes' prior express written consent.

99.     To compound matters, on information and belief, Plaintiff Barnes received numerous other autodialed telemarketing calls to his cell phone as a result of becoming entangled in Defendants' unlawful telemarketing scheme.

***Calls to Plaintiff Haddey***

100.    Plaintiff Nancy Haddey visited the Affordable Health Care Website in search of health insurance quotes online.

101.    After Plaintiff Haddey visited the website, she received an autodialed telemarketing call placed by All Web Leads on behalf of Defendant Simple Health on February 5, 2018 at 1:20 p.m.

102.    Upon answering the call, there was an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.

103.    The All Web Leads representative asked Plaintiff Haddey a series of questions to determine whether she met certain criteria specified by Defendant Simple Health in order to find out if she was a qualified consumer to whom it could sell insurance.

104.    After the series of questions concluded, Plaintiff Haddey was then transferred to a health insurance sales representative for Defendant Simple Health.

105.    During that call, Defendant Simple Health proceeded to solicit Plaintiff Haddey to purchase insurance.

106.    The call was annoying and harassing to Plaintiff Haddey, and an invasion of her privacy.  The call violated the TCPA because it was made without Plaintiff Haddey's prior express written consent.

107.    To compound matters, on information and belief, Plaintiff Haddey received numerous other autodialed telemarketing calls to his cell phone as a result of becoming entangled in Defendants' unlawful telemarketing scheme.

### Calls to Plaintiff Hills

108.    Plaintiff Hills visited the Affordable Health Care Website in search of health insurance quotes online.

109.    After Plaintiff Hills visited the website, he received an autodialed telemarketing call placed by All Web Leads on behalf of Defendant USHealth on March 27, 2018 at 8:43 a.m.

110.    Upon answering the call, there was an immediate pause on the other end, followed by a distinct "clicking" noise before the connection with a representative was made.

111.    The All Web Leads representative asked Plaintiff Hills a series of questions to determine whether he met certain criteria specified by Defendant USHealth in order to find out if he was a qualified consumer to whom it could sell insurance.

112.    After the series of questions concluded, Plaintiff Hills was then transferred to Jason Greif, a health insurance sales representative for Defendant USHealth.[6]

113.    During that call, Defendant USHealth, through its representative Jason Greif, proceeded to solicit Plaintiff Hills to purchase insurance.

114.    The call was annoying and harassing to Plaintiff Hills, and an invasion of his privacy.  The call violated the TCPA because it was made without Plaintiff Hills' prior express written consent.

---

[6] *See* https://ushagent.com/JASONGREIF, last accessed August 14, 2019.

115.    To compound matters, on information and belief, Plaintiff Hills received numerous other autodialed telemarketing calls to his cell phone as a result of becoming entangled in Defendants' unlawful telemarketing scheme.

## DEFENDANTS USED AN ATDS TO PLACE UNSOLICITED TELEMARKETING CALLS TO PLAINTIFFS AND THE CLASS

116.    Defendants used an All Web Leads dialing system to place all the calls to Plaintiffs and Class Members at issue in this action.

117.    Defendants placed all of the calls to Plaintiffs and Class Members with an ATDS, as that term is defined by the TCPA.

118.    Plaintiffs knew that Defendants used an ATDS because right before each call connected there was a distinctive "click and pause" sound, which is associated with a predictive dialing system.

119.    The pause signifies the algorithm of the predictive dialer operating.  Defendants' predictive dialer dials hundreds of thousands of numbers at once without any human intervention. Defendants' predictive dialer only transferred the call to a live agent once a human being answered the call.

120.    Indeed, for all of the calls placed to Plaintiffs and the Class, All Web Leads has affirmatively testified under oath that it used a predictive dialing system of the sort that constitutes an ATDS under the TCPA.

121.    The All Web Leads dialing system used by Defendants has the capacity to store telephone numbers to be called in a database.  The All Web Leads dialing system used by Defendants has the capacity to produce telephone numbers to be called.

122.    The All Web Leads dialing system used by Defendants has the capacity to generate telephone numbers to be called, including to capacity to generate telephone numbers to be called using a random or sequential number generator.

123.    The dialing system can do this by inputting a straightforward computer command.

124.    Following that command, the dialing system will sequentially dial numbers.

125.    First, it would dial a number such as (555) 000-0001, then (555) 000-0002, and so on.

126.    The All Web Leads dialing system used by Defendants has the capacity to dial telephone numbers automatically with no human intervention.

127.    Once a list of phone numbers was stored, produced, generated, or otherwise entered into the All Web Leads dialing system, a dialing campaign caused calls to be made automatically to telephone numbers based on certain criteria and without requiring the user to dial the phone numbers.  The dialing systems maintained an electronic record of each call made.

128.    Once a call center agent became available to field the outgoing ATDS call, the All Web Leads dialing system automatically connected an available call center agent with each successfully completed outbound call.

129.    The dialing system was connected to one or more relational databases that also store, produce, and/or generate phone numbers to be dialed.  Each such relational database is a component of the All Web Leads dialing system.

130.    Each call center agent used a software program that connected to the All Web Leads dialing system.  Once an agent logged in, the dialing systems connected the agent to successfully completed outbound calls.  The software programs are a component of the All Web Leads dialing system.

131.    Defendants' predictive dialing system placed hundreds of thousands of calls to phone numbers programmed into the system.

132.    This dialing was done automatically without any human intervention or further effort.

133.    Finally, on information and belief, the All Web Leads dialing system used by Defendants is driven by software that utilizes an algorithm that determines when All Web Leads will make a phone call on behalf of Defendants.  The dialer makes this determination automatically and without human intervention.  These characteristics too are indicative of an ATDS.

## DEFENDANTS ARE VICARIOUSLY LIABLE
## FOR THE CALLS INITIATED BY THEIR AGENT ALL WEB LEADS

134.    For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

135.    In its January 4, 2008 ruling, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.  *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

136.    In fact, the Federal Communication Commission has instructed that sellers such as Defendants may not avoid liability by outsourcing telemarketing to third parties, such as All Web Leads:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are

identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

137.    On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."[7]

138.    The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls.  28 FCC Rcd at 6586 (¶ 34).

139.    The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

[A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts.  Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

---

[7]      *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling").

FCC Rcd at 6592 (¶ 46).

140.   Finally, courts have held that sellers can be held vicariously liable under a ratification theory when they accept the benefit of a telemarketer's calls. *See, e.g.*, *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 779 (N.D. Ill. 2014). "A principal can ratify an act by (a) manifesting assent that the act shall affect the person's legal relationships, or (b) conduct that justifies a reasonable assumption that the person so consents." *Id.* quoting Restatement (Third) of Agency § 4.01(1) (2006).

141.   What's more, in its May 2013 FCC Ruling, the FCC made clear that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46). Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

142.   Here, all of the Defendants are vicariously liable for the calls placed by All Web Leads to Plaintiffs and proposed Class members because All Web Leads has testified under oath that it placed the calls at issue in this Complaint on behalf of Defendants and for their intended benefit.

143.   Defendants and All Web Leads entered into standard contracts under which Defendants paid All Web Leads to place autodialed telemarketing calls to consumers on their behalf and then transfer those calls to Defendants' representatives. Under the contract, Defendants controlled the manner and timing under which these telemarketing calls were placed. Defendants further specified certain criteria in respect to the type of consumer they directed All Web Leads to call and transfer to their representatives for purposes of selling insurance. Defendants benefitted

22

from the calls placed by All Web Leads on their behalf because they provided Defendants with additional business prospects.

## DEFENDANTS HARMED PLAINTIFFS IN A MANNER
## IDENTICAL TO THE MANNER IN WHICH THEY HARMED THE CLASS

144.    Plaintiffs and proposed Class members were harmed by these calls. They were temporarily deprived of legitimate use of their phones because the phone line was tied up during the telemarketing calls and their privacy was improperly invaded. Moreover, these calls injured Plaintiffs and Class members because they were frustrating, obnoxious, annoying, were a nuisance and disturbed the solitude of Plaintiffs and the class.

145.    In particular, because each of the automated calls that Defendants placed was directed to a cellular telephone, the calls interrupted and disturbed Plaintiffs and Class Members from their daily lives.

146.    Plaintiffs are in the same Class as all other consumers who utilized the Affordable Health Care website during the relevant time period.  After visiting the Affordable Health Care, Plaintiffs and the Class subsequently received autodialed telemarketing calls without providing their prior express written consent.

## CLASS ACTION ALLEGATIONS

147.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.

148.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons within the United States who (i) filled out an insurance quote form on the Affordable Healthcare Website (www.affordable-health-insurance-plans.org); (ii) received a non-emergency telephone call from All Web Leads; (iii) to a cellular phone; and (iii) was transferred by a representative of All Web Leads to any of the Defendants.

Collectively, all these persons will be referred to as "Class members." Plaintiffs represent, and are members of, the Class.

149.    Excluded from the Class are the Defendants, and any entities in which the Defendants have a controlling interest, the Defendants' agents and employees, and their legal representative, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and Plaintiffs' counsel and their staff members.

150.    Plaintiffs reserve the right to amend the Class definition and/or add a subclass of persons whose calls were transferred to each respective Defendant, if further information and discovery indicate that doing so would be appropriate.

151.    Plaintiffs are in possession of records that identify the exact number of members of the Class and affirm that the Class consists of hundreds of thousands of Class Members.

152.    Plaintiffs and all members of the Class have been harmed by the acts of Defendants.

153.    This Class Action Complaint seeks injunctive relief and money damages.

154.    The joinder of all Class Members is impracticable due to the size and relatively modest value of each claim.

155.    Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

156.    Further, the Class can be identified through business records generated by All Web Leads that are in Plaintiffs' possession.

157.    There are well-defined, nearly identical, questions of law and fact affecting all parties.

158.    The questions of law and fact, referred to above, involving the Class claims predominate over questions which may affect individual Class members.

159.   Such common questions of law and fact include, but are not limited to, the following:

    a.   Whether Defendants used an automatic telephone dialing system in making non-emergency telemarketing calls to Class members' cell phones;

    b.   Whether Defendants are vicariously liable for the calls placed by All Web Leads on Defendants behalf and for their intended benefit to Plaintiffs and the Class members;

    c.   Whether Defendants can meet their burden of showing they obtained prior express written consent to make the calls at issue;

    d.   Whether Defendants' conduct violated the TCPA;

    e.   Whether Defendants' conduct was knowing and/or willful;

    f.   Whether Defendants are liable for statutory damages; and

    g.   Whether Defendants should be enjoined from engaging in such conduct in the future.

160.   As persons who received non-emergency telemarketing calls via an automatic telephone dialing system, without providing their prior express written consent to Defendants within the meaning of the TCPA, Plaintiffs assert claims that are typical of each Class member who also received such phone calls.

161.   Further, Plaintiffs will fairly and adequately represent and protect the interests of the Class.

162.   Plaintiffs have no interests which are antagonistic to any member of the Class.

163.   Plaintiffs have retained counsel experienced in handling class action claims involving violations of federal consumer protection statutes, including claims under the TCPA.

164.     A class action is the superior method for the fair and efficient adjudication of this controversy.

165.     Class wide relief is essential to compel Defendants to comply with the TCPA.

166.     The interest of the Class members in individually pursuing claims against the Defendants is slight because the statutory damages for an individual action are relatively small, and are therefore not likely to deter Defendants from engaging in the same behavior in the future.

167.     Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated and the Class members, by definition, did not provide the prior express consent required under the statute to authorize such calls to their cellular telephones.

168.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate.

169.     Moreover, on information and belief, Plaintiffs allege that the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

## CAUSES OF ACTION

### Count I

### Statutory Violations of the Telephone
### Consumer Protection Act, 47 U.S.C. § 227 *et seq.*

170.     Defendants' acts and omissions in placing automated telemarketing calls to Plaintiffs and Class Members without their prior written express constitute numerous and multiple violations of the TCPA, including but not limited to each of the above cited provisions of 47 U.S.C. § 227 *et seq*.

171.     As a result of Defendants' violations of 47 U.S.C. § 227, *et seq*., Plaintiffs and Class members are entitled to an award of $500 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

172.     Plaintiffs and Class members are also entitled to and do seek injunctive relief prohibiting the Defendants' violations of the TCPA in the future.

173.     Plaintiffs and Class members are also entitled to an award of attorneys' fees and costs as provided by law.

### Count II

### Knowing and/or Willful Violations
### of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*

174.     Defendants' foregoing acts and omissions in placing automated telemarketing calls to Plaintiffs and Class Members without their prior written express constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227 *et seq.*

175.     As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and each member of the Class are entitled to treble damages of up to $1,500 for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

176.     Plaintiffs and all Class members are also entitled to and do seek injunctive relief prohibiting such conduct violating the TCPA by Defendant in the future.

177.     Plaintiffs and Class members are also entitled to an award of attorneys' fees and costs as provided by law.

### <u>JURY DEMAND</u>

Plaintiffs are entitled to, and demand, a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant Plaintiffs and all Class members the following relief against the Defendants:

A.      Injunctive relief prohibiting such violations of the TCPA by Defendants in the future;

B.       As a result of Defendants' willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiffs seek for themselves and each Class member treble damages, as provided by statute, of up to $1,500 for each and every call violation of the TCPA;

C.      As a result of Defendants' statutory violations of 47 U.S.C. § 227(b)(1), Plaintiffs seek for themselves and each Class member $500 in statutory damages for each and every violation of the TCPA;

D.      An award of attorneys' fees and costs to counsel for Plaintiffs and the Class;

E.      An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class; and

G.      Such other relief as the Court deems just and proper.

*[Space Intentionally Left Blank]*

Dated: October 11, 2019

Respectfully submitted,

/s/ *Jeffrey L. Cox*

**SALLAH ASTARITA & COX, LLC**
Jeffrey L. Cox
Florida Bar No. 0173479
Email: jlc@sallahlaw.com
James D. Sallah
Florida Bar No. 0092584
Email: jds@sallahlaw.com
3010 North Military Trail, Ste. 210
Boca Raton, Florida 33431
Telephone: (561) 989-9080
Facsimile: (561) 989-9020

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Daniel M. Hutchinson (*pro hac vice* to be filed)
Email: dhutchinson@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Jonathan D. Selbin (*pro hac vice* to be filed)
Email: jselbin@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

**KOZONIS & KLINGER, LTD.**
Gary M. Klinger (*pro hac vice* to be filed)
Email:  gklinger@kozonislaw.com
4849 N. Milwaukee Ave., Ste. 300
Chicago, Illinois 60630
Telephone:  (312) 283-3814
Facsimile:  (773) 496-8617

*Attorneys for Plaintiffs and the Proposed Class*