# EXH. "A"

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN KARPILOVSKY and JIMMIE CRIOLLO, JR., individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>ALL WEB LEADS, INC., a Delaware corporation,<br><br>*Defendant.* | Case No.: 1:17-cv-01307<br><br>**WRITTEN REPORT OF JEFFREY A. HANSEN** |

# EXPERT REPORT OF JEFFREY A. HANSEN

1. My name is Jeffrey A. Hansen. I am an adult over the age of 18, a resident of the state of California, and I reside at 2625 Kings View Circle, Spring Valley, CA 91977. Unless indicated otherwise, I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2. I was asked to prepare this written expert report by Plaintiff's counsel in the above-captioned matter, Lieff Cabraser Heimann & Bernstein, in support of Plaintiff's Designation of Expert Witnesses.

***3.*** I have been retained in this case at a rate of $300 per hour, for all services rendered, and $380 per hour for depositions.

***Experience and Credentials.***

4. I am the principal of Hansen Legal Technologies, Inc. My firm is in the business of handling Information Technology, including investigations and analysis of electronic data. I have served as an expert or consultant in more than 150 TCPA class action lawsuits, and as an expert or consultant in numerous other civil cases.

5. With regard to my experience as an expert and consultant in legal matters, generally, I have frequently served as an expert witness and consultant to law firms in conducting computer forensic analysis. I have also assisted in electronic discovery issues.

6. Specific to this case, my firm was retained to assist Plaintiffs' counsel in evaluating and analyzing the telephone dialing systems used by Defendant All Web Leads, Inc. ("All Web Leads") in placing telephone calls to Plaintiffs. I have also been retained to assist Plaintiffs and their counsel in evaluating and analyzing electronic data related to the calls and other electronic data associated with computer systems and/or telephone dialing systems used by All Web Leads. In that respect, I have extensive experience with data warehousing, including data warehousing related to telemarketing

and autodialers in general. I am familiar with the procedures involved in such practices, and I have personally engaged in data warehousing regarding the compilation of certain lists, including demographic and target audience lists for telemarketing, and have personally repaired defective lists to eliminate improperly formatted and corrupted data.

7. I also frequently act as a consultant to companies that engage in the use of autodialers, and I am familiar with their use and procedures, and the technical aspects of that business. In that capacity, I have assembled, configured, maintained, operated all aspects of autodialers, and interfaced with the telecommunications providers through whose networks the autodialers operate.

8. I have set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines to outbound call centers, run from three locations, capable of generating over 1 million calls per hour. When building these systems, I have used various software and hardware solutions for predictive and autodialers, both proprietary and open source, and customized those systems for their particular uses. I myself have used and maintained predictive and autodialers, and trained others to do the same.

9. Further, I am familiar with the manner in which outbound dial lists are used and maintained in the industry in which All Web Leads operates. Similarly, I am familiar and have experience with, and know how to use, databases containing cell block identifiers and ported number lists, both of which identify cellular type telephone numbers and are typically used in these industries.

10. Over the last twenty-eight (28) years, I have also had extensive experience in a broad range of other areas in the electronic and information technology fields and obtained many certifications such as MCP 4.0, A+, Network+, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security+, CIW Security Analyst. From the hardware perspective, I have extensive experience in troubleshooting and repairing at the component level, and building various systems for various purposes. I have designed, built and maintained computer networks in a variety of environments from commercial

businesses to very large DoD networks. I have taught approximately 1,000 others the skills to become computer network engineers themselves.

11. I have had extensive experience in dealing with security breaches and hardening computer networks against those breaches. I have handled many computer forensic and E-Discovery matters, including internal investigations in companies, working at the FBI sponsored Regional Computer Forensics Laboratory, and founding a computer forensics and E-Discovery firm over 9 years ago. I have also had extensive experience with the set-up and use of predictive and autodialers. (*See Exhibit A – Resume of Jeffrey A. Hansen*).

12. I have been called to testify in the following civil matters: *Casey v. Valley Center Ins. Agency Inc*., No. 37-2008-00004378-SC-SC-CTL (San Diego Superior Court); *Stemple v. QC Holdings, Inc*., No. 3:12-cv-1997-BAS-WVG (S.D. Cal.); *Hahn v. Massage Envy Franchising*, No: 3:12-cv-00153-DMS-BGS (S.D. Cal.); *Abdeljalil v. General Electric Capital Corp*., No. 3:12-cv-02078-JAH-MDD (S.D. Cal.); *Webb v. Healthcare Revenue Recovery Grp., LLC* No. 3:13-cv-0737 JD (N.D. Cal.); *Balschmiter v. TD Auto Fin., LLC*, No. 2:13-cv-01186-JPS (E.D. Wis.)*; Marks v. Crunch San Diego, LLC*, No. 3:14-cv-0348-BAS-BLM (S.D. Cal.); *Olney v. Job.Com,* Inc., No. 1:12-cv-01724-LJO-SKO (E.D. Cal.); *Guarisma v. ADCAHB Medical Coverages, Inc., et al.*, No. 1:13-cv-21016-FAM (S.D. Fla.); *Mashiri v. Ocwen Loan Servicing, LLC*, et al., No. 3:12-cv-02838-L-MDD (S.D. Cal.); *Monty J. Booth, Attorney at Law, P.S. v. AppStack, Inc*., No. 2:13-cv-01533-JLR (W.D. Wash.); *Rinky Dink, Inc. v. World Business Lenders, LLC*, No. 2:14-cv-00268-JCC (W.D. Wash.); *Reid v. I.C. Systems, Inc*., No. 2:12-cv-02661-ROS (D. Ariz.); *Molar v. NCO Financial Systems*, No. 3:13-cv-00131-BAS-JLB (S.D. Cal.); *Simms v. Simply Fashion Stores LTD, et al.* No. 1:14-cv-00737-WTL-MJD (S.D. Ind.); *Swaney v. Regions Bank*, No. 2:13-cv-0544-JHE (N.D. Ala.); *Hooker v. SiriusXM Radio, Inc.*, No. 4:13-cv-00003-AWA-LRL (E.D. Va.); *Mey v. Frontier Commc'ns Corp.,* No. 13-cv-01191-MPS (D. Conn.); *Johnson v. Yahoo!, Inc.,* No. 1:14-cv-2028 (N.D. Ill.); Calderin v. Yahoo! Inc., 1:14-cv-2753 (N.D. Ill.); *Charvat v. Travel*

*Services, et al.* No. 1:12-cv-5746 (N.D. Ill.); *Zani v. Rite Aid Corp*., No. 14-cv-9701-AJN (S.D. N.Y.), *A.D. v. Credit One Bank*, NA, No. 1:14-cv-10106 (N.D. Ill.); *Stoba v. Saveology.com, LLC, et al.*,, No. 3:13-cv-2925-BAS-NLS (S.D. Cal.); *Henderson v. United Student Aid Funds, Inc*., Case No. 3:13-cv-1845-JLS-BLM (S.D. Cal.); *Marciano v. Fairwinds Fin. Services,* No. 6:15-cv-1907-CEM KRS (M.D. Fla); *Lee v. Global Tel*Link Corp.*, No. 2:15-cv-02495-ODW-PLA (C.D. Cal.) [consolidated with *Martin v. Tel*Link Corp.*, 2:15-cv-03464-ODW-PLA (C.D. Cal.); *Brinker v. Normandin's*, No. 5:14-cv-03007-EJD (N.D. Cal.); *Ung v. Universal Acceptance Corp.,* No. 15cv127 RHK-FLN (D. Minn*); Goodson v. Designed Receivable Solutions, Inc.*, No. 2:15-cv-03308-JVS-JPR (C.D. Cal); *Dominguez v. Yahoo!, Inc*., No. 2:13-cv-01887-MMB (E.D. Penn); *Ashkenazi v. Bloomingdales, Inc*., No. 3:15-cv-02705-PGS-DEA (D. N.J.); *Abante Rooter and Plumbing, Inc. v. Birch Commc'ns, Inc*., No. 1:15-cv-03562-AT (N.D. Ga.); *Roark v. Credit One Bank*, N.A., No. 0:16-cv-00173-PAM-FLN (D. Minn); *Lowe, et al. v. CVS Pharmacy, Inc., et al.* No. 1:14-cv-03687 (N.D. Ill); *Zaklit, et al. v. Nationstar Mortgage, LLC*, No. 5:15-cv-02190-CAS-KK (C.D. Cal); *Banks v. Conn Appliance, Inc*., No. 01-16-0001-0736 (American Arbitration Association); *Verma v. Memorial Healthcare Grp., Inc., et al.,* No. 3:16-cv-00427-HLA-JRK (M.D. Fla); *Herrick v. GoDaddy.com, LLC*, No. 2:16-cv-00254-DJH (D.Ariz.); *In Re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, No. 1:13-md-02493-JPB-JES (N.D.W.Va.); *Mey v. Ventura Data, LLC* No. 5:14-cv-123-JPB-JES (N.D.W.Va.); *Lucero v. Conn Appliances*, No. 01-16-0004-7141 (American Arbitration Association); *Dennis v. Progressive Leasing*, No. 01-16-0002-8798 (American Arbitration Association – Final Hearing); *Marcus v. CVS Pharmacy, Inc*., No.: 3:15-cv-259 PGS-LHG (D. N.J.); *Webster v. Conn Appliances, Inc*., No. 01-16-0003-3774 (American Arbitration Association - Final Hearing); *Snyder v. Ocwen Loan Servicing*, LLC, No. 1:14-cv-08461 (N.D. Ill.); *Abrahams v. First Premier Bank*, No. 01-16-0003-8128 (American Arbitration Association - Final Hearing); *Wooten v. Conn Appliances, Inc*., No. 01-16-0003-5557 (American Arbitration Association – Final Hearing); *W. v.*

*California Serv. Bureau, Inc.*, No. 4:16-cv-03124-YGR (N.D. Cal.); *Summers v. Conn Appliances*, No. 01-16-0004-1183 (American Arbitration Association - Final Hearing); *Raffin v. Medicredit*, No. 2:15-cv-04912-MWF-PJW (C.D. Cal); *Freeman, et al. v. Wilshire Commercial Capital, LLC*, No. 2:15-cv-01428-WBS-AC (E.D. Cal); *Tomeo v. Citigroup, Inc.*, No. 1:13-cv-04046 (N.D. Ill.); *Jurist v. Receivables Performance Mgmt., LLC*, No. 1240022589 (JAMS ARBITRATION).

***Work and Analysis in this Case***

13. I have reviewed various documents and evidence from this case relating to the calls made to Plaintiffs and the proposed class, and I have reviewed various other documents relating to the use and regulation of autodialers. Specifically, I have reviewed the following documents: 1) Exhibit B - FCC 2003 Order (*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C. Red. 14014); 2) Exhibit C - The Big 2 Myths You Probably Believe About Manual Dialing - Part 1; 3) Exhibit D - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2; 4) Exhibit E - US patent 3943289; 5) Exhibit F - US patent 4933964; 6) Exhibit G - Noble TCPA Compliance Solution; 7) Exhibit H - ATDS and predictive dialers 1970-1992; 8) Exhibit I - Davox Marketing; 9) Exhibit J - US Patent 3229042; 10) Exhibit K - US Patent 3317678; 11) Exhibit L – FCC 2015 Order; 12) Exhibit M - FCC response to ACA; 13) Exhibit N - 1992 FCC Order; 14) Exhibit O – FCC 2012 Order; 15) Exhibit P - Wash Times 1991; 16) Exhibit Q – FCC 2008 Order; 17) Exhibit R - agents-guide (obtained from webapps.five9.com/product-documentation/?un=2260599_chartrand.etienne@gmail.com on 2015-12-03); 18) Exhibit S – Screenshots from Five9 Administrator for Sales video on Five9 YouTube Channel (Obtained 16March2015 from https://www.youtube.com/watch?v=vW3kqXjH0RY); 19) Exhibit T - abandoned-call-ivr-script (obtained from webapps.five9.com/product-

documentation/?un=2260599_chartrand.etienne@gmail.com on 2015-12-03); 20) Exhibit U - dnc-opt-out-compliance (obtained from webapps.five9.com/product-documentation/?un=2260599_chartrand.etienne@gmail.com on 2015-12-03); 21) Exhibit V - dropped-call-percentage-reporting (obtained from webapps.five9.com/product-documentation/?un=2260599_chartrand.etienne@gmail.com on 2015-12-03); 22) Exhibit W - release-notes (obtained from webapps.five9.com/product-documentation/?un=2260599_chartrand.etienne@gmail.com on 2015-12-03); 23) Exhibit X - campaign manager 2 (obtained from webapps.five9.com/product-documentation/?un=2260599_chartrand.etienne@gmail.com on 2015-12-03); 24) Exhibit Y - campaign-administrators-guide (obtained from webapps.five9.com/product-documentation/?un=2260599_chartrand.etienne@gmail.com on 2015-12-03); 25) Exhibit Z - ivr-administrators-guide (obtained from webapps.five9.com/product-documentation/?un=2260599_chartrand.etienne@gmail.com on 2015-12-03); 26). Exhibit AA - Deposition transcript of Ginther; 27) Exhibit AB - IMS_Do_Not_Contact_Solutions; 28) Exhibit AC - About_IMS; 28) Exhibit AD - IMSCustomerList; 29) Exhibit AE - wireless-block-identifier; 30) Exhibit AF – NPAC; 31) Exhibit AG – All Web Leads' Responses to Plaintiffs' First Set of Interrogatories.

14. Additionally, I have analyzed the Five9 predictive dialer in other matters numerous times over the last 10 years.

15. Based upon the documents and evidence I have reviewed, and my experience and knowledge of the Five9 predictive dialer, I conclude that All Web Leads used a predictive dialer, a type of automatic telephone dialing system, to place calls to the Plaintiffs.

***All Web Leads used a Predictive Dialer, which has the Characteristics of an Automatic Telephone Dialing System***

16. I have been retained in part to evaluate whether the telephone dialing system used by All Web Leads to place the calls at issue in this case was a predictive dialer or otherwise has the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227. ("TCPA"). According to the FCC:

> "The TCPA defines an 'automatic telephone dialing system' as 'equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.' The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an 'automatic telephone dialing system,' the equipment need only have 'the *capacity* to store or produce telephone numbers (emphasis added)'…."

*(See Exhibit B – In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Red. 14014, at ¶ 131-134 (2003) (the "FCC 2003 Order")).*

17. Within the industry, "Automatic Telephone Dialing System", or "auto-dialer" for short, has been attributed to any system with the capacity to automatically dial phone numbers. Naturally, for a system to automatically dial phone numbers, the system must either produce or store those phone numbers. Within the industry, these terms were not applied to systems that would only call one pre-programed number such as a home security system or speed dial, but were applied to systems used for telemarketing or call centers. These names have been attributed to these systems for over 50 years. There are different types of "auto-dialers" such as "predictive dialers," "power dialers," and dialers that deliver pre-recorded messages (commonly referred to as "voice broadcasting"). Within the industry, these systems are not defined by any other terms when used in other dialing modes such as manual or preview. The fact that these terms have been used to define auto-dialers for over 50 years can be corroborated or discovered by a few clicks through the Patent Office's website (new patents cite old patents) which yields these historical insights. The FCC's understanding seems to be consistent with the industry's understanding. (*See Exhibit B – FCC 2003 Order, at* ¶¶

*131-134 (finding that a predictive dialer falls within the TCPA's definition of "automatic telephone dialing system"); Exhibit O – FCC 2012 Order footnote 12, ¶ 20; Exhibit L – FCC 2015 Order pp. 11-24; Exhibit M - FCC response to ACA page 57 of 110).* Within the industry, autodialers only need to store or produce numbers and call them to be an ATDS. In this case, the predictive dialing system used by Defendant is capable of doing both. Because the terms used within the industry are the same as the terms used by the FCC and the TCPA, to clarify my use of the terms in my report, I will point out that when referring to the FCC's or TCPA's definition I will clarify, as I did in the previous paragraph, by stating, "characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act." Otherwise, when I use these terms, I am using them in the context which they have been used for decades within the industry.

18. The term "Predictive dialer" is a technical term used to describe the type of dialing system. Predictive dialers all work under the same guiding principle: they transfer telephone numbers to be called to a list or "campaign."[1] (*See Exhibit S – Screenshots from Five9 Administrator for Sales video on Five9 YouTube Channel pp. 1-2, 19-60*) This list of numbers is then dialed without human intervention. (*See Exhibit S – Screenshots from Five9 Administrator for Sales video on Five9 YouTube Channel pp. 61-69*) The calls are made, using multiple telephone lines, in advance of being connected to a live operator. Using a complex computer algorithm, the dialing system will "predict" how far in advance to make the calls in attempt to prevent time wasted in listening to rings, answering machines, disconnected phone numbers, and calls that are not answered. (*See Exhibit S – Screenshots from Five9 Administrator for Sales video on Five9 YouTube Channel pp. 71-74*) This functionality has not changed since Davox marketed their predictive dialers in the 1980's. (*See Exhibit I – Davox Marketing*).

---

[1] A "campaign" is like a "pool" in that it is calling a list of phone numbers organized by some predefined criteria for a specific purpose. Further, "pool" and "campaign" as used throughout this Report have the same meaning.

19. The term "Predictive dialer" was not created by the FCC in their 2003 Order or their 1992 Order. Nor was the term "automatic telephone dialing system" created by Congress. These are terms that have been used to describe such equipment, by those in the industry for decades. Norman A. Sheldon filed a patent (*Exhibit E – US patent 3,943,289*) on July 12, 1974 for what he called a "automatic telephone dialing system" (*Exhibit E – US patent 3,943,289 page 4 column 2 line 63*) which dialed numbers from a sequential number generator and delivered pre-recorded messages to telephone subscribers. He chose to use a sequential number generator because at that time computer storage was very expensive (*Exhibit E – US patent 3,943,289 page 4 column 2 lines 2-11*). Although he chose to use a sequential number generator, stored lists of numbers had been used for many years prior to his patent. (*See Exhibit J – US Patent 3229042; Exhibit K – US Patent 3317678*). In July 25, 1989, Bassem M. Girgis filed a patent (*Exhibit F - US patent 4,933,964*) for a "predictive outbound dialing system" (*Exhibit F - US patent 4,933,964 page 19 column 2 line 53*) which used an "input call list" (*Exhibit F - US patent 4,933,964 figure 3*) stored in the system to call those numbers in advance predicting when a live agent would be available using a predictive algorithm. This system was designed to call out on more lines than available agents from a list of numbers, listen for rings, busy, and answered calls, and connect the calls to agents by predicting when they would be available. This is the precise capability of the Predictive dialers used today and the hosted predictive dialer used by All Web Leads. The functionality of the autodialers and predictive dialers has not changed since long before the TCPA until now with the exception that modern dialers can make more calls in a shorter period of time. Attached as Exhibit H are examples of articles and job postings illustrating that the exact same type of equipment was used over the last four decades, along with the terms "Automatic Telephone Dialing System" and "Predictive Dialer," long before Congress or the FCC considered the equipment. (*See Exhibit H - ATDS and predictive dialers 1970-1992; Exhibit M – FCC response to ACA, at pp. 13-14 footnote 3*). The equipment described in the TCPA and the FCC

2003 Order have precisely the same characteristics as the equipment that is in use today and used by All Web Leads.

20. The fact that the dialer places calls to numbers stored by the dialing system and delivers predictive dialed calls indicates that the dialer has the characteristics of an ATDS, as it relates to predictive dialers, as clarified in the FCC 2003 Order:

> The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call. The principal feature of predictive dialing software is a timing function, not number storage or generation. ...[T]hese machines are not conceptually different from dialing machines without the predictive computer program attached.
>
> ….
>
> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "capacity to store or produce telephone numbers (emphasis added). . .." It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of

> the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop.
>
> ….
>
> [T]o exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result. ...We believe the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress.

(*Exhibit B – FCC* 2003 Order, at ¶¶ *131-134 (finding that a predictive dialer falls within the TCPA's definition of "automatic telephone dialing system").*)

21. Additionally, the properties of the dialing system has the precise capabilities of an ATDS as further clarified by FCC Order 12-56 (May 21, 2012), wherein, the FCC stated:

> Under the TCPA, the term "automatic telephone dialing system" is defined as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* at § 227(a)(1). The Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention whether or not the numbers called are randomly or sequentially generated or come from calling lists.

(*See Exhibit O – FCC 2012 Order ¶ 20 and footnote 12*).

22. Based upon the documents and evidence I have reviewed and my knowledge of the Five9 predictive dialer, the calls that All Web Leads made to Plaintiffs and the class members were made using a predictive dialer. As explained further below, in my expert opinion, the below dialing system that is discussed in detail has the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the TCPA.

23. Mr. Ginther, All Web Lead's designated witness on the dialer, testified that All Web Leads used Five9 dialer up until 2016. (*See Exhibit AA – Deposition Transcript of Ginther, pp. 30-31, 75-76*). From 2016 to present, All Web Leads used an "in house", "software driven" dialer. (*See Exhibit AG – Int. No. 12*).

24. The Five9 dialer is a predictive dialer that, like other predictive dialers, calls lists of numbers organized as "campaigns." The Five9 predictive dialer can be used to make predictive dialed calls. (*See Exhibit R – agents-guide; Exhibit S – Screenshots from Five9 Administrator for Sales video on Five9 YouTube Channel pp. 1-2, 19-77; Exhibit T – abandoned-call-ivr-script p. 10; Exhibit U – dnc-opt-out-compliance; Exhibit W – release-notes; Exhibit X - campaign manager 2; Exhibit Y – campaign-administrators-guide pp. 30-50*) The Five9 predictive dialer is capable of dialing a list of numbers loaded into a "campaign" or "pool" on the dialer. (*See Exhibit S – Screenshots from Five9 Administrator for Sales video on Five9 YouTube Channel pp. 61-77; Exhibit X - campaign manager 2; Exhibit Y – campaign-administrators-guide pp. 30-50; Exhibit AB - Sutherland pptgt pp. 6-12*) The system is also capable of using one of several CRM (Customer Relation Management) databases. The Five9 cloud based predictive dialer then can automatically dial those numbers and deliver predictive dialed calls. (*See Exhibit R – agents-guide; Exhibit S – Screenshots from Five9 Administrator for Sales video on Five9 YouTube Channel pp. 61-77; Exhibit X - campaign manager 2; Exhibit Y – campaign-administrators-guide pp. 30-50*) For predictive, power, and progressive dialed calls, the dialer will call using multiple

Case 2:19-cv-24718-CMA Document 74-16 Entered on FLSD Docket 01/12/2022 PageID #9426

telephone lines per agent. (*See Exhibit S – Screen shots from Five9 Administrator for Sales video on Five9 YouTube Channel pp. 61-69; Exhibit X - campaign manager 2; Exhibit Y – campaign-administrators-guide pp. 30-50; Exhibit AA - Deposition transcript of Ginther pp. 31:1-25, 32:1-23, 45:1-25, 46:1-4, 83:1-25, 84:1-25, 85:1-25, 86:1-25, 87:1-25, 88:1-6*) All phone calls, regardless of how dialed, are called using the same equipment, terminals, phone, PBX, and Five9 predictive dialer before going to the PSTN (public switched telephone network).

25. After reviewing the above documents, and based on my experience with predictive dialers and autodialers, and the Five9 predictive dialer used by All Web Leads, I am of the opinion that All Web Leads used the above predictive dialer to place telephone calls for the time period it was utilized by All Web Leads. I am also of the opinion that this dialer has the capacity to store or produce numbers to be called, using a random or sequential number generator, and the capacity to call such numbers. Specifically, the dialer is capable of automatically and without human intervention calling numbers that are stored as a list, which itself is stored in a table of a database.

26. I also conclude that the "in house" dialer All Web Leads utilized has all the hallmarks of being a predictive dialer and thus, an autodialer. Like other predictive dialers I am familiar with, All Web Leads describes its own dialer as "software driven." (*See* Exhibit AG – Int. No. 12). In fact, All Web Leads' corporate representative testified that "we have an algorithm that determines when we make a phone call" and that AWL's dialer makes that determination "automatically." (*See Exhibit AA - Deposition transcript of Ginther pp. 31:1-25, 32:1-23, 45:1-25, 46:1-4, 83:1-25, 84:1-25, 85:1-25, 86:1-25, 87:1-25, 88:1-6*). I reserve the right to supplement this opinion after reviewing additional information about All Web Leads "in house" dialer that was produced by All Web Leads too late for inclusion in this report.

27. Thus, in my expert opinion, the dialing system (as outlined above) has the characteristics of an ATDS as contemplated by the TCPA and clarified by the FCC, because this system has the capacity to store numbers in a list and dial them without

human intervention and also has the capacity to generate numbers to form a list for dialing without human intervention.

28. A predictive dialer has the capacity of an ATDS, not because it predicatively dials calls, but simply because it has the capacity to automatically call numbers stored in a list. The predictive algorithm in a predictive dialer predicts when agents would be available and is no way related to the storage or production of numbers. With all the predictive dialers that I have worked with in the last 17 years, the predictive algorithm was in no way related to the storage or production of numbers. The FCC correctly stated this, "The principal feature of predictive dialing software is a timing function, not number storage or generation." (*See Exhibit B – FCC 2003 Order* at ¶ *131*)

29. All predictive dialers have the characteristics of an ATDS, but not all ATDS's are predictive dialers. As the FCC stated, "The principal feature of predictive dialing software is a timing function, not number storage or generation.... [T]hese machines are not conceptually different from dialing machines without the predictive computer program attached." (*See Exhibit B – FCC 2003 Order* at ¶ *131*). The FCC also has grouped dialers into two categories: those that have live agents (predictive dialers) and those that are agent-less (pre-record, artificial voice). (*See Exhibit N - 1992 FCC Order* ¶¶ *8, 9*) I myself use the example of predictive dialers when explaining what capacities are in view in the FCC 2003 Order. I do this because there are many more features than just storing numbers in a list and automatically calling them, and using the example of the predictive dialer I can highlight that none of those other features have anything to do with computer storage or the generation of numbers. Systems, such as the one listed above, used by All Web Leads, that are capable of calling lists of numbers to deliver a pre-recorded message or systems that call numbers to deliver a text or SMS message have no live agents involved (Referred to as "Agent-less" calls by those in the industry); therefore, there is little confusion on their capacity to store or produce numbers and to call them. But all those other features in a predictive

dialer are in addition to storing numbers and automatically calling them. Other features found in predictive dialers—such as ACD routing, AMD detection, preview mode and other dialing modes, predictive algorithms, abandon rate, cloud based, skills based routing, blended campaigns, CRM integration, types of databases used by the system, VoIP, POTS lines, T1 lines, PRI lines, operating systems, and computer hardware—all have nothing to do with the system's capacity to store a list of numbers and to automatically call them. For these reasons, I use the example of predictive dialers to explain what features make it an ATDS, because at the same time I can explain what features do not make it an ATDS.

30. I would note that predictive dialers, including the Five9 predictive dialer, generally have the capacity to deliver pre-recorded messages and agent-less IVR campaigns to telephone consumers without the need of live agents. (*See Exhibit T – abandoned-call-ivr-script p. 10; Exhibit U – dnc-opt-out-compliance p. 10; Exhibit X - campaign manager 2 p. 4; Exhibit Z – ivr-administrators-guide p. 1*).

31. The dialer's mode of operation however does not change the capacity of the system. Changing the mode of dialing is done by effectively clicking a radio button and clicking "save." The FCC considered this when clarifying "capacity." (*See Exhibit M - FCC response to ACA pp. 31-36; Exhibit S – Screenshots from Five9 Administrator for Sales video on Five9 YouTube Channel pp. 61-74; Exhibit T – abandoned-call-ivr-script p. 10; Exhibit U – dnc-opt-out-compliance p. 10; Exhibit W – release-notes; Exhibit X - campaign manager 2 pp. 45-56; Exhibit Y – campaign-administrators-guide pp. 46, 48, 50*) The administrator of a predictive dialer is not capable of taking away any functionality of the system. The administrator can only choose to not use it. The fact that one campaign can be configured to use preview mode and another campaign configured to use predictive, while other agents place calls manually, all occurring at the same time, illustrates the system has the current capacity regardless of the dialing mode selected for a particular campaign. (*See Exhibit V – dropped-call-percentage-reporting p. 5; Exhibit X - campaign manager 2 p. 12)*

32. Most predictive dialers, which I have seen, also employ a "manual" mode and a "preview" mode, which presents the calling agent with information about the to-be-called party before the number is actually dialed. The agent then has the ability to accept that lead based on the information presented, or reject it and await the dialer to present a new lead to be called. Because a dialer has a preview mode or a manual mode and the calling party may have used those modes, however, does not mean that the dialer fails to qualify as an ATDS.

33. I am not alone in my understanding of whether manual mode has any effect on the capacity of the predictive dialer. Recently, Ontario Systems (the creators of the popular Guaranteed Contacts predictive dialer and the FACS system) published a two-part article on the subject of dialing modes and their impact on the predictive dialer's capacity as defined by the FCC. Using the example of manually dialed calls through the predictive dialer, Ontario Systems highlights that a Predictive dialer is a predictive dialer regardless how it is used. Manual dialing occurs when one presses all ten digits of the phone number to place the call, not a number stored on the list. Preview mode calls the numbers from the list stored in the predictive dialer's database. (*See Exhibit S – Screenshots from Five9 Administrator for Sales video on Five9 YouTube Channel pp. 70*) The FCC clarified that predictive dialers are an ATDS because of their capacity, not how the operator uses it. The industry has attributed the name "predictive dialer" to these systems regardless of how they are used. The two articles from Ontario Systems are relevant in their entirety (*See Exhibit C - The Big 2 Myths You Probably Believe About Manual Dialing - Part 1; Exhibit D - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2*), however, the summary highlights the main point:

> In other words, if the technology you use to contact consumers has any capacity to dial predictively, or pull from a database of numbers and dial them, current judicial opinion indicates it is an autodialer. Period. This is true whether you launch the call manually by pressing a field, or if you enter

> 10 digits on a keypad. On the other hand, it opined such a call is a manual dial if it's made using a system to contact consumers that is not tied, routed from or to, or in any way connected to your autodialer. If it's not, it is unlikely you are contacting consumers using an automatic telephone dialing system as defined by the FCC.

(*Exhibit D* - *The Big 2 Myths You Probably Believe About Manual Dialing* - *Part 2*). In other words, to call cell phones, one should use a separate PBX entirely (plain phone system).

34. Another manufacturer of a popular predictive dialer agrees. Noble Systems offers a solution which routes calls to wireless numbers through a separate PBX entirely. *(See Exhibit G* - *Noble TCPA Compliance Solutio*n). There is no indication however that All Web Leads had such a solution in place for the calls at issue in this matter. On the contrary, All Web Leads used the Five9 Predictive Dialer Solution.

35. As stated above, the FCC relies upon the following definition of an "automatic telephone dialing system":

> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have "the capacity to store or produce telephone numbers (emphasis added)…."

(*See Exhibit B – FCC 2003 Order at ¶ 132*). This definition is consistent with the definition used by those in the industry long before adopted by Congress or the FCC. (*See Exhibit E* - *US patent 3,943,289, Exhibit F* - *US patent 4,933,964, Exhibit H* - *ATDS and predictive dialers 1970-1992, Exhibit I* - *Davox Marketing, Exhibit J* - *US Patent 3229042, Exhibit K* - *US Patent 3317678*).

36. Even more recently, on July 10, 2015, the FCC issued a Declaratory Ruling and Order in which the FCC clarified the term "capacity." (*See Exhibit L – FCC 2015 Order, at ¶¶ 10-24*).

37. In light of the FCC's July 10, 2015 Declaratory Ruling and Order in which the FCC takes a broad definition of "capacity" as it relates to autodialing numbers and the generation of numbers, I would point out that making a computer generate a list of 10 digit numbers "out of thin air", is a relatively trivial task. All computers can generate random or sequential numbers. A computer system simply cannot operate without the ability to do so. A "pseudo random number generator" is a key element in allowing a computer to "compute." Computers are designed to do math and counting i.e. "to compute." For example, typing "seq 6192486000 6192486999 > sequential_numbers_to_call.txt" creates a list of 1000 Sprint Wireless Numbers to be called (this was done on my regular laptop with no additional software installed). In other words, my laptop running Linux has natively installed a "sequential number generator" that can produce a list of phone numbers. Windows computers have a similar command line function as well. Typing "for /L %i in (2480000,1,2489999) do @echo 619%i >> sequential_numbers_to_call.txt" generates the same list on a Windows computer. The easiest for the novice user would be to simply use the "seq" command illustrated above, the Windows equivalent illustrated above, a loop in bash, /dev/random, or /dev/urandom. There are many additional ways to generate random or sequential numbers. The following is a small example:

- awk -v min=6192480000 -v max=6192489999 'BEGIN{srand(); print int(min+rand()*(max-min+1))}'
- shuf -i 6192480000-6192489999 -n 1000 > sprint_numbers.txt
- python -c "import random; print random.randint(6192480000,6192489999)"
- counter=6192480000

```
while [ $counter -le 6192489999 ]
do
echo $counter
((counter++))
done
```

- perl -le 'print 6192480000+int(rand(1000)) for(1..1000)' > sprint_numbers.txt

38. Computers' ability to "compute" is completely dependent on their ability to generate numbers. Computers simply would not function without the ability to do so. Not only can the operating system be used to generate numbers, but all programing languages that I have seen rely on the ability to generate numbers. One of the most common programming functions, in all languages, is a loop. For example, to generate that same list of Sprint wireless sequential numbers a simple loop in the PHP script is all that is needed: "for ($i = 6192480000; $i < 6192490000; $i++)." One of the examples above is a bash loop. In both examples, the loop is starting at 6192480000 and counting in increments of 1 until reaching 6192489999. Computers are completely dependent on their ability to count. For example, a predetermined period of time is set between program updates such as an anti-virus. A loop would be used to count units of time until a number is reached before attempting another update. When going to a website, the web browser is instructed to wait before giving up on displaying the page. That wait period is also a loop in which the computer counts increments of time. This can be seen in any autodialer, as they have timers that run for various timeout periods. The generation of random numbers is just as important and as common a task in computer programming as the generation of sequential numbers. The most obvious use is cryptography and certain numerical algorithms, but many other operations need a modest amount of unpredictability. Some simple examples might be to present a user with a "Random Quote of the Day", or determining which way a computer-controlled

adversary might move in a computer game. Weaker forms of randomness are used in hash algorithms and in creating amortized searching and sorting algorithms.

39. The Five9 client software runs on Microsoft Windows (*See Exhibit X - campaign manager 2*). Of course, storage of numbers does not discriminate on how the numbers were produced as computer storage can store any kind of data regardless of how it was produced whether loaded from a list of known numbers or a list of sequentially generated numbers. (*See Exhibit M – FCC Response to ACA. at. 6, 12, 13, 24, 36, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 52*).

40. I would note that the industry has classified any system capable of auto-dialing phone numbers as an auto-dialer whether the numbers are stored **or** produced. Also, for systems to produce numbers, those numbers still need to be stored before dialing them.

41. The FCC's orders and rulings provide me with the information that assists me in forming an opinion about whether All Web Leads' dialing system has the characteristics of an ATDS. Based on those orders and rulings, based upon my review of the documents and evidence provided in this case, based on my knowledge of computer storage and computer processing, and based on my knowledge of autodialers and predictive dialers, it is also my expert opinion that the calls placed by All Web Leads to Plaintiffs and proposed class members using the dialers described in detail above were made using a predictive dialer that has the characteristics of automatic telephone dialing systems as defined by the TCPA and FCC.

***Additional steps taken in Analyzing All Web Leads' Dialing System***

42. To analyze the system, the first step was to identify the components of the system. All the individual components of the system by themselves are incapable of performing any specific task. For example, predictive dialing software needs to be installed on an operating system such as Microsoft Windows or Linux. The operating

system is required to be installed before any other programs such as the predictive dialing software. The operating system also is what would allow programs, such as the dialing software, to interact with the hardware of the system (standard computer hardware). To illustrate, no single component of an automobile is capable of transporting someone from point A to point B, but instead many components are combined to create a single system. The automobile needs a chassis, akin to the operating system of a dialer. The automobile also needs an engine, akin to the dialing software. Typically, software is not created to perform a task that is handled by the operating system in which the software is installed on, such as the generation of phone numbers discussed earlier in my report. To do so would be redundant, as would be having two radios in the automobile. In the case of the Five9 predictive dialer, the predictive dialer is hosted online and the administrative interface is installed on a client to the dialer, usually Microsoft Windows. Earlier in my report, I provided the exact command to generate a list of numbers from either the server hosting the dialer software or the client the operator of the dialer sits at. Lists are loaded from the client to the dialer, settings to campaigns are made from the client computer. This "Client-Server" relationship is the same as the mainframe-terminal relationship seen in computer systems in the past. This "Client-Server" relationship is often referred to as a "Distributed Application Structure" because it partitions tasks or workloads over a resource or service much the same way that each component of an automobile is responsible for a particular function in the overall system. This distributed application model has also been referred to as "Software as a Service" ("SaaS") with web based applications combined with the client computer connecting to the web server. The FCC highlights that the system is comprised of components in their 2003 order "a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of

numbers." (*See Exhibit B – FCC 2003 Order, at ¶ 131*) The FCC again highlighted that many systems, even if spread across multiple entities, can form an ATDS. (*See Exhibit L – FCC 2015 Order ¶¶ 23-24*)

43. I would note that predictive dialers were intended to primarily call from a defined list of numbers since the time they became popular in the mid 1970's. On a technical level, while one could generate and call a list of sequential numbers, it would confuse the algorithm and the dialer would generate many abandoned calls. As I illustrated earlier, "predictive dialers," and "autodialers" were common parlance within the telemarketing and debt collection industries, but also well understood outside those industries two decades later when the TCPA was enacted. (*See Exhibit M - FCC response to ACA pp. 13-14 footnote 3; Exhibit P - Wash Times 1991; Exhibit N - 1992 FCC Order ¶¶ 8-9; Exhibit X - campaign manager 2 pp. 2-6*). As stated earlier in my report, predictive dialers' functionality has not changed since Davox marketed their predictive dialers throughout the 1980's.

44. Finally, in my analysis, the mode of operation does not change the capabilities of the system. As I pointed out earlier, a predictive dialer can easily be instructed to make auto-dialed calls or to make preview dialed calls with a couple clicks of the mouse. My analysis was to determine if the system was an "auto-dialer." Even when the dialer is not placing calls, it is still an auto-dialer, and within the industry there is no other name attributed to such systems when used in other modes or whether the dialer calls from a defined list or generated list. (*Also see Exhibit Q – FCC 2008 Order ¶¶ 12-14*)

45. I would point out that predictive dialers have been included in the definition of an ATDS by the telemarketing and debt collection industry for five decades with or without the ability to generate numbers, and the FCC has specifically included predictive dialers as an ATDS since 1992. (*See Exhibit N - 1992 FCC Order ¶¶ 8,9; Exhibit B – FCC 2003 Order, at ¶¶ 131-134; Exhibit H - ATDS and predictive dialers 1970-1992; Exhibit I - Davox Marketing*)

***Work and Analysis in this Case Regarding Calls Made by All Web Leads***

46. In this case, I was also asked to compare or "scrub" the call records produced by All Web Leads to telephone number databases widely used by the telecommunications industry to identify the telephone numbers that are assigned to cell phones, and identify whether the telephone numbers assigned to cell numbers have been previously or subsequently reassigned or "ported" to or from landlines.

47. I am familiar with the databases used to determine whether a particular telephone number is a assigned to a cell phone, and determine whether the number was ever reassigned from a landline to a cell phone or vice versa, because I personally use them on a regular basis. I have personally compared lists of telephone numbers against these same databases to identify which numbers are cell phones, and whether and when numbers had been reassigned from landline to cell phone or vice versa, on countless occasions over the years.

48. The database I regularly use and rely on in my business to determine if a telephone number has been assigned to a cell phone is the Interactive Marketing Solutions or "IMS" wireless cell block identifier list. This list was compiled by Interactive Marketing Solutions and the Direct Marketing Association. (*See Exhibit AB – IMS_Do_Not_Contact_Solutions; Exhibit AC – About IMS; Exhibit AD – IMS Customer List; Exhibit AE – wireless block identifier*).

49. The FCC's Enforcement Bureau, Telecommunications Consumers Division ("TCD") has relied on the IMS database, which the FCC has described as "an industry standard, commercially available database of known assigned and ported wireless numbers…" FCC 14-59, 29 FCC Rcd 5537, ¶7 n.16 (May 8, 2014) ("TCD compared the call records to an industry-standard, commercially available database of known assigned and ported wireless numbers to determine whether the Company made robocalls to wireless telephones. *See* Interactive Marketing Solutions, Inc. Website,

http://www.ims-dm.com/index.shtml"); *see also* DA 13-265, 28 FCC Rcd 1840, ¶ 9 and n. 25 (Mar. 15, 2013), citing Interactive Marketing Solutions, Inc. Website http://www.ims-dm.com/index.shtml); and DA 15-530, 30 FCC Rcd 4548, ¶ 7 and n. 24 (May 4, 2015), citing Interactive Marketing Solutions, Inc. Website Homepage http://www.ims-dm.com/mvc/index.php.

50. The database I regularly use and rely on in my business to determine whether a cell phone number has been reassigned or "ported" to or from a landline is the Neustar ported-to-wireless list and ported-to-landline list. Neustar is the ultimate resource of these lists because it was selected by the FCC to be the administrator of the Number Portability Administration Center (NPAC), the telecommunication industry's common, authoritative database for routing calls for numbers ported between landline and wireless. (*See Exhibit AF - NPAC*). The FCC also appointed Neustar as the North American Numbering Plan Administrator, which is responsible for the U.S. telephone numbering system. See 2003 Order at ¶ 170 ("NeuStar as the North American Numbering Plan Administrator, the National Pooling Administrator, and the LNP Administrator makes information available that can assist telemarketers in identifying numbers assigned to wireless carriers.")

51. ACA International, the Association of Credit and Collections Professionals, lists both Interactive Marketing Solutions and Neustar as "industry vendors that provide cell phone scrubbing services." (www.acainternational.org/tcpaarticle-cell-phone-scrubbing-services-36882.aspx (last visited August 22, 2016)).

52. I have been provided with Defendant's outbound dial lists. I first imported the Outbound Dial Lists for answered calls (Bates Numbers AWL Karpilovsky 0050) and the cell block identifier into tables in a relational database. I then joined those call records with the leads to the lead lists (Bates Numbers AWL Karpilovsky 0049) to identify names and email addresses of those numbers called. I then performed queries to identify all the numbers that were called that were assigned to wireless numbers. I

Case 1:18-cv-01307 Document #: 76-1 Filed: 01/11/18 Page 27 of 28 PageID #:942

then imported ported number lists into the relational database and was able to identify any numbers called that were ported from wireless to landline and landline to wireless. I performed these queries utilizing the date columns to identify those numbers that were were wireless at the time of the call. (For the numbers ported to wireless, I performed those queries to identify those numbers that were ported to wireless at least 15 days before called by the Defendant.)

53. I then imported the Outbound Dial Lists for unanswered calls (Bates Numbers AWL Karpilovsky 0127 and 0129) and the cell block identifier into tables in a relational database. I then performed queries to identify all the numbers that were called that were assigned to wireless numbers. I then imported ported number lists into the relational database and was able to identify any numbers called that were ported from wireless to landline and landline to wireless. I performed these queries utilizing the date columns to identify those numbers that were wireless at the time of the call. (For the numbers ported to wireless, I performed those queries to identify those numbers that were ported to wireless at least 15 days before called by the Defendant.)

54. The following are the results of my analysis:

- Total answered calls to wireless numbers: 14,374,977
- Total unique wireless numbers with answered calls: 2,200,380
- Total calls to wireless numbers with no answer (1st attempt): 4,718,308
- Total unique wireless numbers called with no answer (1st attempt): 1,717,848
- Total unique wireless numbers called both answered and not answered: 2,286,545

55. If the class period at issue here were to be modified for any reason, I could run the same queries and produce accurate results for any set of date ranges within the data set I analyzed.

56. I reserve the right to amend, modify or supplement the statements and opinions set forth herein as appropriate.

57. I declare that the foregoing is true and correct, subject to the laws of perjury of the United States. Executed in Spring Valley, CA on this 1st day of December 2017.

Jeffrey A. Hansen